## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LAUREN G., through her | : |
| Parents SCOTT G. and JACQUELINE G., | : |
|     Plaintiffs, | : |
| | :    CIVIL ACTION |
|       v. | : |
| | :    NO. 11-6915 |
| WEST CHESTER AREA SCHOOL | : |
| DISTRICT, | : |
|     Defendant. | : |

**November __6__, 2012**                                                        **Anita B. Brody, J.**

### MEMORANDUM

This action has been brought by Lauren G., and her parents Scott G. and Jacqueline G. ("Parents"), against West Chester Area School District (the "District"). Parents allege that the District failed to provide Lauren with a free appropriate public education ("FAPE") in violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, and § 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794.[1] This action stems from Parents filing of a due process complaint. A due process hearing has already occurred, and a decision has been issued by a Pennsylvania Due Process Hearing Officer ("Hearing Officer"). Both parties object to portions of the Hearing Officer's decision. Currently before me are the parties' cross-motions

---

[1] The IDEA requires states receiving federal funding to provide a FAPE to all disabled children residing within the State. 20 U.S.C. § 1412(a)(1). Section 504 of the RA prohibits discrimination on the basis of disability in federally funded programs. 29 U.S.C. § 794(a). "[W]hen a state fails to provide a disabled child with a free and appropriate public education, it violates the IDEA. However, it also violates the RA because it is denying a disabled child a guaranteed education merely because of the child's disability." *Andrew M. v. Del. Cnty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007)

for judgment on the administrative record.  I exercise jurisdiction to review the Hearing Officer's

decision under 20 U.S.C. § 1415(i)(2).  For the reasons set forth below, I will grant in part and

deny in part both motions.

## I.  BACKGROUND[2]

### A.  Factual Background

Lauren is a twenty year-old former District student.  In seventh and eighth grade, Lauren

attended the District.  Parents withdrew Lauren from the District for the 2006-2007 ninth grade

school year, and enrolled her in Bishop Shanahan High School ("Bishop Shanahan"), a private

denominational school.  Lauren remained at Bishop Shanahan for the first half of tenth grade, the

2007-2008 school year.  In January or February 2008, Lauren returned to the District for the

second half of tenth grade to attend East High School ("East High").

A few weeks after Lauren's re-enrollment in the District, East High's guidance counselor

learned from a counselor at Bishop Shanahan that Lauren had "behavioral issues."  H.O.D. ¶ 6.

In the first couple of months that Lauren attended East High, she met weekly with the guidance

counselor as part of the District's effort to ensure a smooth transition for new students.  Although

Lauren appeared to be handling her classes, the guidance counselor noticed that Lauren was

struggling with attendance.  Moreover, Lauren self-reported to the guidance counselor that she

was seeing a psychiatrist.

On March 8, 2008, Lauren was admitted to an inpatient psychiatric hospital, Devereux

---

[2] Citations in this section will generally be to the Hearing Officer's factual findings and
the stipulations of the parties, which can be found at pages 3-8 of the Hearing Officer's Decision
("H.O.D.").  This section will also refer to the notes of testimony ("N.T."), Parents' exhibits
("P-"), and the District's exhibits ("S-"), in the limited circumstances where the Hearing Officer
failed to make a finding on a relevant factual issue.

Beneto Center ("Devereux"), for suicidal ideation.  On March 9, 2008, Parents informed the District of Lauren's hospitalization.  Lauren's guidance counselor spoke with Lauren's mother about the hospitalization and noted that Lauren had been admitted for "possible bipolar, depression," and "suicidal thoughts."  H.O.D. ¶ 9 (internal quotation marks omitted).

On March 21, 2008, upon discharge from Devereux, Lauren entered the American Day Program ("American Day") for outpatient care.  While at American Day, Lauren was diagnosed with Depression, Not Otherwise Specified (NOS), Obsessive Compulsive Disorder, Oppositional Defiant Disorder, and possible Attention Deficit Disorder.  The assessment also noted that Lauren used marijuana; however, Lauren was not diagnosed with a substance abuse.  Lauren explained to her mother that use of marijuana helped make the repetitive thoughts about the devil and the number six go away.

On March 24, 2008, Parents emailed a letter from Lauren's psychiatrist dated January 21, 2008 to the guidance counselor.  The letter stated that Lauren had been diagnosed with Major Depression, Attention Deficit/Hyperactivity Disorder, Obsessive Compulsive Disorder, and Anxiety Disorder.  At this time, reports prepared by Lauren's teachers noted that Lauren was cutting classes in math and history, and was being extremely talkative in biology.

In early April 2008, Lauren returned to East High after her treatment at American Day.  Upon her return, Lauren felt the need to meet with the crisis counselor or guidance counselor once or twice a week.  A few days after her return, Parents requested in writing that the District begin the process of getting Lauren a § 504 Accommodation Plan ("§ 504 Plan").[3]  Parents

---

[3] "A Section 504 plan specifies the accommodations and modifications that a school district will provide to ensure that a disabled student receives an appropriate education."  *S.M. ex rel. G.M. v. Sch. Dist. of Upper Dublin*, No. 10-4038, 2012 WL 2953727, at *1 (E.D. Pa. July 20,

requested a § 504 Plan after Lauren's mother spoke with a friend about Lauren's hospitalization. The friend had told Lauren's mother that Lauren's psychiatric hospitalization was a "huge red flag" for the District to provide Lauren with accommodations.  H.O.D. ¶ 15.

The District's Child Study Team, which included Lauren's guidance counselor, met to determine if Lauren was eligible for a § 504 Plan.  The Child Study Team reviewed academic records, student meetings, and staff inclusion (written feedback provided by Lauren's teachers) before making a determination.  On the afternoon of April 15, 2008, the guidance counselor emailed Lauren's mother and requested "additional information regarding your request for 504 services."  P-24.  However, on April 16, 2008, the District issued a Denial of Eligibility Letter, informing Parents that Lauren did not meet the criteria for a § 504 Plan.  The letter also informed Parents of their right to request an informal conference with a school district representative, a due process hearing, or assistance from the Pennsylvania Department of Education.  Additionally, Parents were notified of their right to file a federal lawsuit under the RA.  Attached to the letter was a copy of the Procedural Safeguard Notice, which explained Parents' rights.  Moreover, the letter also invited Parents to schedule an informal conference or to request a due process hearing by indicating such request on the bottom of the letter and returning it to the guidance counselor. Parents elected to do nothing at the time.

At the start of Lauren's junior year, the 2008-2009 school year, Lauren's problems began to escalate.  N.T. 138.  When Lauren returned to school after the summer, she was withdrawn, experiencing depression, complaining of headaches and other somatic symptoms, cutting classes, avoiding school, and voicing a desire to drop out.  Lauren's mother had to physically drag Lauren

2012).

to school.  In an effort to get Lauren help, Lauren's mother spoke "on the phone a lot" with the guidance counselor and other District staff.  H.O.D. ¶ 18 (internal quotation marks omitted).

In September and October 2008, Lauren frequently visited the crisis counselor.  On September 29, 2008, Lauren told the crisis counselor that her "moods and emotional [sic] are not right," and that she was "tired all the time."  H.O.D. ¶ 19 (internal quotation marks omitted).  The guidance counselor recommended that Parents find Lauren a new psychiatrist to help stabilize her.

In October 2008, Lauren informed the crisis counselor that she was experiencing feelings of not wanting to do anything.  The crisis counselor reported this to the guidance counselor, who advised Lauren of various programs that she could elect to participate in.  Lauren did not choose to participate in any of them.  Lauren's failure to seek out these services signified to the guidance counselor that  "you can lead a horse to water, but you cannot make them, you know, drink it." H.O.D. ¶ 20 (internal quotation marks omitted).

In addition to her emotional struggles, Lauren was also struggling academically.  In October 2008, the guidance counselor noted that Lauren was failing classes.  N.T. 231.  During the first quarter, Lauren failed history, earth science, Spanish, and Algebra.  P-56.

On October 20, 2008, Parents requested in writing that the District conduct a psychiatric evaluation and a psychoeducational evaluation of Lauren.  However, on October 23, 2008, Lauren was again admitted to American Day because she was acting erratically, refusing to attend school, smoking marijuana, and had stolen her mother's car in the middle of the night. Parents notified the District of Lauren's admittance to American Day.  P-43.

On October 30, 2008, Parents completed a Permission to Evaluate (PTE)- Evaluation

Request Form, requesting "a complete evaluation so we can get some direction on how to help our daughter." H.O.D. ¶ 24 (internal quotation marks omitted). Additionally, the PTE noted that Lauren "ha[d] been diagnosed with a Mood Disorder, OCD, ODD, depression and an anxiety disorder which has an effect on her ability to perform academically." *Id.* (internal quotation marks omitted).

At the end of October 2008, Lauren's psychiatrist and psychologist recommended that Parents meet with an educational consultant to place Lauren. In November 2008, Lauren's psychologist recommended a therapeutic residential boarding school due to Lauren's "failing grades" and "recurrent acting-out behaviors" in order to provide Lauren with "the placement and treatment she needs at this time." P-58. As the psychologist explained, a residential placement would assist Lauren in "school success." *Id.*

On November 7, 2008, Lauren was discharged from American Day. Her Discharge Summary noted that Parents were considering placing Lauren in a boarding school. It also noted that Lauren required ongoing substance abuse treatment.

On November 10, 2008, the school psychologist determined that it was not necessary to conduct a psychiatric evaluation of Lauren because she had just been evaluated at American Day. On November 24, 2008, the District issued a Permission to Evaluate (PTE)- Evaluation Consent Form seeking "to conduct an evaluation in order to explore if the symptoms of [Lauren's] Mood Disorder adversely affects her educational performance." H.O.D. ¶ 28 (internal quotation marks omitted). The PTE, along with a copy of the Procedural Safeguards were sent by regular and certified mail. The certified letter was returned to the District marked "unclaimed."

Parents did not respond to the District's PTE request because sometime between

6

November 17 and November 28, 2008 Lauren began attending King George School ("King George"), a therapeutic boarding school in New England.

King George offers "an overall behavioral modification program that supplements with therapeutic aspects." P-71 at 4. While at King George, Lauren was assigned an academic advisor, a team leader, and a therapist, who met every few weeks to review Lauren's development. *Id.* Lauren spent half of her week at King George on academics, and spent the rest of the week doing activities like "rock climbing, art classes, things that would help her therapeutically. P-71 at 4; N.T. 156:15-17. Additionally, Lauren attended individual, group, and family therapy, as well as a recovery/12-step program. P-73 at 3.

In November or December 2008, Parents retained legal counsel. Additionally, Parents hired a Nationally Certified School Psychologist with licensure and school certification in his home state to conduct a private psychological evaluation of Lauren. On December 16, 2008 and January 5, 2009 the psychologist evaluated Lauren. Lauren was diagnosed with Dysthymic Disorder among other diagnoses. The psychologist concluded that Lauren qualified as an educationally disabled person because she has serious emotional disturbance and a specific learning disability in math calculation. Additionally, he opined: "Lauren distinctly requires a therapeutic boarding school for two years or more such as King George School to aid her mental health care by structuring her day, supporting her sobriety, and attending school regularly. Lauren would not readily recover without such 24 hour support." P-67 at 6.

On April 1, 2009, Parents filed a due process complaint seeking only an independent

educational evaluation ("IEE").[4]  The District declined to fund an IEE.  However, on April 16,

2009, the District agreed to conduct its own evaluation.  Lauren was not available for testing

until July 2009 because she was living at King George, which was nine hours away from the

District.  N.T. 99.

On July 9, 2009, the District conducted its evaluation of Lauren.  As part of the

evaluation process, the District psychologist had access to Lauren's diagnoses from two previous

psychiatric hospitalization programs, as well as the private psychological evaluation completed

by the out-of-state school psychologist in January 2009.

On August 15, 2009, Lauren graduated early from King George, after attending and

passing all of her classes.  N.T. 155:22-24; S-20; P-73 at 3.  Following King George, she was

able to successfully transition to Bloomsburg University.  P-73 at 3.

On October 21, 2009, the District completed its Evaluation Report ("ER") for Lauren and

issued a Notice of Recommended Educational Placement ("NOREP").  The ER concluded that

Lauren did not have a disability and was not eligible for special education.  S-12.  The ER

explained its conclusion as follows:

> Given Lauren's previous diagnosis and social-emotional and behavioral challenges,
> one might quickly associate Lauren with the educational disability of Emotional
> Disturbance (ED).  It is clear that Lauren may have demonstrated one or more of the
> ED characteristics.  However, it is unknown how long Lauren truly exhibited these
> characteristics, and if this duration of time would qualify as, the law states, 'a long
> period of time.'  Furthermore, these characteristics do not appear to have adversely
> affected Lauren's educational performance to a marked degree. . . . Any social-
> emotional or behavioral issues did not seem to be manifesting themselves within the
> school environment.

---

[4] The regulations implementing the IDEA provide: "A parent has the right to an
independent educational evaluation at public expense if the parent disagrees with an evaluation
obtained by the public agency."  34 C.F.R. § 300.502.

H.O.D. ¶ 43-44 (internal quotation marks omitted).  Based on the ER, the NOREP concluded that

Lauren was not in need of special education.  Additionally, the NOREP concluded that Lauren

was not in need of a § 504 Plan or an Individualized Education Plan ("IEP")[5] because she did not

demonstrate a disability.

On November 5, 2009, Parents requested an IEE at public expense.  On April 16, 2010,

the District agreed to fund an IEE.  A psychologist completed the IEE on September 15, 2010.

The IEE psychologist concluded:

> [Lauren's] struggles with OCD and emotional/behavioral functioning during high
> school resulted in a significant impairment in global functioning, including academic
> performance.  Lauren's presentation during 10th and 11th grade (based on record
> review, consultation with treating therapists and clinical interview) suggests that she
> was struggling with an emotional disturbance that impeded her ability to learn, access
> academic curriculum and attend school on a daily basis to a marked degree. . . .
> Lauren's school district can consider identification of Lauren as requiring SDI based
> on an emotional disturbance.

H.O.D. ¶ 48 (internal quotation marks omitted).

On March 11, 2011, after unsuccessful attempts to reach a settlement with the District,

Parents filed a formal due process complaint in which they requested a due process hearing.

**B. Procedural Background**

Lauren's due process hearing was conducted in two sessions on May 10, 2011 and July 5,

2011.  At the end of the first session, the Hearing Officer concluded that the statute of limitations

---

[5] The IEP provides a program of individualized instruction for each special education student.  *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010).  The IEP is "the 'centerpiece' of the IDEA's system for delivering education to disabled children.  An IEP consists of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services."  *Id.* (citations omitted) (internal quotation marks omitted).

limited Lauren's recovery period under the IDEA and § 504 to the two years prior to the filing of the due process complaint.  The Hearing Officer determined that Lauren could not recover for any injuries that occurred prior to March 11, 2009 because a formal due process complaint was not filed until March 11, 2011.  Thus, the potential period for recovery was March 11, 2009 through August 15, 2009, the date Lauren graduated high school.  The Hearing Officer devoted the second session to the merits of Lauren's claims.

On August 6, 2011, the Hearing Officer issued a written decision on the merits of Lauren's claims.  The Hearing Officer concluded that the District had violated its "child find" obligations when it failed to identify Lauren as a Protected Handicapped Student under § 504 in April 2008.  The Hearing Officer also concluded that the District had violated its "child find" obligations when it failed to identify Lauren as a student eligible for special education under the IDEA in July 2009.[6]  Although Parents requested a complete evaluation of Lauren in October 2008, the Hearing Officer reasoned that the District did not have a duty to evaluate Lauren while she was attending King George because she was outside the District and unavailable for evaluation.  Thus, it concluded that the District did not violate its "child find" obligations under the IDEA until Lauren returned from King George in July 2009.[7]  According to the Hearing Officer, the District's evaluation failed to identify Lauren as a student eligible for special education under the IDEA; therefore it failed to offer Lauren an IEP.  The Hearing Officer further

_____

[6] "School districts have a continuing obligation under the IDEA and § 504 to identify and evaluate all students who are reasonably suspected of a having a disability under the statutes." *P.P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 738 (3d Cir. 2009).  This is referred to as the statutes' "child find" obligations.  *See id.*

[7] However, the Hearing Officer never considered whether the District had violated its "child find" obligations under the IDEA prior to Lauren's placement at King George.

concluded that the failure to provide Lauren with an IEP in July 2009 denied Lauren a FAPE.

While the Hearing Officer initially identified the potential period of recovery as March 11, 2009 to August 15, 2009 based on the statute of limitations, the Hearing Officer limited the recovery period to July 21, 2009 to August 15, 2009.  Although the District evaluated Lauren on July 9, 2009, and did not complete its ER until October 21, 2009, at which point it concluded that Lauren was ineligible for special education under the IDEA, the Hearing Officer concluded that a reasonable amount of time to complete the ER would have been two weeks; thus, the Hearing Officer determined that Lauren was not denied a FAPE until July 21, 2009.  The Hearing Officer further determined that Parents were only entitled to reimbursement for the academic and social/emotional portions of the program at King George, but not the residential portion because the record did not establish that Lauren required a residential placement for educational purposes. As a result, the Hearing Officer awarded Parents tuition reimbursement for one-half the cost of a day in the program for each of the thirteen school days within the period from July 21, 2009 to August 15, 2009.

## II.  LEGAL STANDARD

"When considering an appeal from a state administrative decision under the IDEA, district courts apply a nontraditional standard of review, sometimes referred to as 'modified de novo' review."  *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010).  Under this standard, the district court must give "due weight" to the findings of the administrative hearing officer.  *Id.*  "Factual findings from the administrative proceedings are to be considered prima facie correct.  If a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute its own notions of sound educational policy for those of local

11

school authorities." *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003) (citation omitted) (internal quotation marks omitted).  "[S]tatute of limitations claims and . . . claims for compensatory education and tuition reimbursement are subject to plenary review as conclusions of law. . . . [W]hether the District fulfilled its FAPE obligations—[is] subject to clear error review as [a] question[] of fact."  *P.P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009).

"Within the confines of these standards, a district court is authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate . . . ." *Bayonne*, 602 F.3d at 564.  "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged."  *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012).

## III.  DISCUSSION

### A.  Statute of Limitations[8]

Based on the statute of limitations, the Hearing Officer concluded that Parents could only recover for the period from March 11, 2009 to August 15, 2009.  In its motion for judgment on the administrative record, "The District respectfully submits that the Hearing Officer's decision regarding the application of the statute of limitations was appropriate and should not be disturbed."  Def.'s Br. 7.  In contrast, Parents contend that the Hearing Officer improperly limited their period for recovery based on a misinterpretation of the limitations periods set forth in the

---

[8] While this section discusses only the limitations periods set forth in the IDEA, the statute of limitations analysis also applies to Parents' § 504 claim.  *See P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 737 (3d Cir. 2009) ("[W]e hold that the IDEA's two-year statute of limitations applies to claims made for education under § 504 of the Rehabilitation Act.").

IDEA and that they should be entitled to recover for the period from September 15, 2008 to August 15, 2009.[9]

Two subsections of 20 U.S.C. § 1415 speak to the limitations period for IDEA claims. The limitations provision in 20 U.S.C. § 1415(f)(3)(C)) provides: "A parent or agency shall request an impartial due process hearing *within 2 years of the date the parent or agency knew or should have known* about the alleged action that forms the basis of the complaint." (emphasis added). Whereas, § 1415(b)(6)(B) provides "[a]n opportunity for any party to present a complaint . . . which sets forth an alleged violation that *occurred not more than 2 years before the date the parent or public agency knew or should have known* about the alleged action that forms the basis of the complaint." 20 U.S.C. § 1415(b)(6)(B) (emphasis added). Parents contend that these two subsections work in conjunction to require a parent to file a due process complaint within two years of when the parent knew or should have known of the alleged action that forms the basis of the complaint, while simultaneously allowing a parent to raise and recover for any claims that occurred within the two years prior to the date the plaintiff knew or should have known of the alleged action that forms the basis of the complaint.

Parents assert that the date they knew or should have known that the District had denied Lauren services under § 504 and the IDEA is September 15, 2010 when they received the IEE report, which concluded that Lauren suffered from an emotional disturbance in 10th and 11th grade that negatively impacted her ability to succeed academically. Thus, Parents argue they

---

[9] Parents also argue that the recovery period in this case should be extended based on the doctrine of equitable tolling. This argument is precluded by Third Circuit precedent that equitable tolling doctrines do not apply to IDEA claims. *D.K. v. Abington Sch. Dist.*, No. 10-2189, slip op. at 19-20 (3d Cir. Oct. 11, 2012).

timely filed their complaint on March 11, 2011 because it was filed within two years from when they knew or should have known the District had denied Lauren services. Additionally, they argue that § 1415(b)(6)(B) entitles them to recover for any violations that occurred within the two years prior to September 15, 2010; therefore, they may recover for the period from September 15, 2008 until August 15, 2009, when Lauren graduated from King George.

Parents theory of the allowable time period for recovery is highly dependent on when they knew or should have known of the alleged action that forms the basis of the complaint. Although the Hearing Officer failed to make any finding as to the date Parents knew or should have known of the District's failures, this date is easily ascertainable.

"Accrual of the statute of limitations does not depend on a plaintiff's knowledge of the law, but rather on a plaintiff's knowledge of the injury." *Centennial Sch. Dist. v. S.D. ex rel. Daniel D.*, No. 10-4129, 2011 WL 6117278 at *5 (E.D. Pa. Dec. 8, 2011) (internal quotation marks omitted). It "is triggered when the parent 'knew or should have known about the alleged *action* that forms the basis of the complaint' and not when the parent becomes aware that the school district's actions are actionable." *J.P. v. Enid Public Schs.*, No. 08-937, 2009 WL 3104014 at *6 (W.D. Okla. Sept. 23, 2009) (quoting 20 U.S.C. § 1415(f)(3)(C)). "In other words, plaintiff has two years from the date she learned or should have learned of her injury to request that the School District provide her with a due process hearing." *Bantum v. Sch. Dist. of Phila.*, No. 10-4195, 2011 WL 1303312 at *4 n.7 (E.D. Pa. April 5, 2011).

In March or April 2008, Lauren's mother learned from a friend that Lauren's psychiatric hospitalization was a "huge red flag" for the District to provide Lauren with accommodations. This information prompted Parents to request a § 504 evaluation of Lauren. In April 2008, the

14

District sent them a Denial of Eligibility Letter informing them that the District did not believe that Lauren qualified as a Protected Handicapped Student.   By the end of October 2008, Lauren's psychologist and psychiatrist recommended that Parents meet with an educational consultant to place her in a different school.  In November 2008, Parents unilaterally moved Lauren to a therapeutic boarding school because they did not feel that Lauren's educational needs were being met at East High.  Additionally, in November or December 2008, Parents retained legal counsel to address the District's treatment of Lauren's education.  While Lauren's parents may not have known and should not have known in April 2008 that the District had denied a FAPE to Lauren, by the time Parents removed Lauren from East High in November 2008 they knew or should have known that the District had not properly addressed Lauren's needs. Moreover, Parents retention of legal counsel in November or December 2008 indicates that they knew or should have known of Lauren's injury and were consulting with counsel to see if the harm was actionable.  Therefore, Parents knew or should have known of the alleged action that forms the basis of their complaint by December 2008.

Parents are not entitled to recover for the time period from September 15, 2008 to August 15, 2009 because they knew or should have known of the alleged action that forms the basis of their complaint by December 2008.  Parents did not file their due process complaint within two years from December 2008, which they were required to do under § 1415(f)(3)(C).  Therefore, they did not timely file their complaint and are not entitled to recover for this longer time period.[10]

---

[10] I do not reach the issue of whether Parents' statutory interpretation of § 1415 is correct because it is unnecessary to do so.

The Hearing Officer concluded that Parents may recover under the statute of limitations for the time period from March 11, 2009 to August 15, 2009.  The District does not challenge the Hearing Officer's determination.  Therefore, I adopt the Hearing Officer's determination and conclude that Parents may only recover for violations that occurred on or after March 11, 2009 to August 15, 2009.

## B.  Lauren's Eligibility for Services Under § 504 and the IDEA

The IDEA requires states receiving federal funding to provide a FAPE to all disabled children residing within the State.  20 U.S.C. § 1412(a)(1).  Section 504 of the RA prohibits discrimination on the basis of disability in federally funded programs.  29 U.S.C. § 794(a).  The Third Circuit has "held that there are few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition and have noted that the regulations implementing § 504 require that school districts provide a free appropriate education to each qualified handicapped person in its jurisdiction."[11]  *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1999) (internal quotation marks omitted), *superseded by statute on other grounds as recognized by P.P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727 (3d Cir. 2009) .  "[C]ase law makes clear that a party

---

[11] Although the IDEA and Rehabilitation Act overlap significantly, the Rehabilitation Act is broader in scope:

> [I]t is well recognized that Section 504 covers more students than does the IDEA. Students with disabilities who are eligible for services under IDEA are also covered by the prohibitions against discrimination on the basis of disability in Section 504 and its implementing regulation at 34 CFR Part 104, but students covered only by Section 504 are not entitled to the rights and protections enumerated by IDEA and its implementing regulations at 34 CFR Part 300.

*Molly L. ex rel. B.L. v. Lower Merion Sch. Dist.*, 194 F. Supp. 2d 422, 427 n.3 (E.D. Pa. 2002) (internal quotation marks omitted).

may use the same conduct as the basis for claims under the IDEA and the RA." *Andrew M. v. Del. Cnty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 349 (3d Cir. 2007). "Therefore, when a state fails to provide a disabled child with a free and appropriate public education, it violates the IDEA.  However, it also violates the RA because it is denying a disabled child a guaranteed education merely because of the child's disability." *Id.* at 350.

A violation of the IDEA is not a per se violation of the RA; thus the elements of a § 504 claim must still be proven.  *Id.* at 349-50.  To prevail on a § 504 claim, a plaintiff must prove that

> (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school.  In addition, the plaintiff must demonstrate that defendants know or should be reasonably expected to know of his disability.

*Ridgewood*, 172 F.3d at 253 (citations omitted).  Denial of a FAPE satisfies prong four because "[i]t is the denial of an education that is guaranteed to all children that forms the basis of the claim."  *Andrew*, 490 F.3d at 350; *see also Centennial Sch. Dist. v. Phil L. ex rel. Matthew L.*, 799 F. Supp. 2d 473, 489 (E.D. Pa. 2011) ("Parents are correct in asserting that they can establish that [the student] was denied a benefits to which all other students were entitled simply on the basis that [the student] was disabled if they can establish a denial of a FAPE.").

The District first challenges Parents' entitlement to tuition reimbursement by arguing that Lauren is neither a Protected Handicapped Student under § 504 nor a student in need of special education under the IDEA.[12]

---

[12] Parents assert that the District has waived these arguments because it did not initially raise them before the Hearing Officer.  I need not address the issue of waiver because I find in Parents' favor that Lauren is a Protected Handicapped Student under § 504 and a student in need of special education under the IDEA.

### 1.  Lauren's Eligibility for Services Under § 504

The District challenges Parents' legal premise that a denial of a FAPE can satisfy the fourth prong of a § 504 claim, which requires proof that the student "was excluded from participation in, denied the benefits of, or subject to discrimination at, the school."  Additionally, the District challenges Parents' factual assertion that the District knew or should reasonably have been expected to know of Lauren's disability in April 2008.

The District claims that Lauren cannot satisfy prong four by alleging she was denied a FAPE because "the FAPE concept is misplaced in Section 504 actions," and § 504 "does not create an affirmative entitlement to a FAPE."  Def.'s Resp. to Pl.'s Mot. 9.  However, as discussed *supra*, the District's contention directly conflicts with Third Circuit precedent –  that a denial of a FAPE is a denial of a guaranteed education to a disabled child and thus violates the RA so long as all other elements of a § 504 claim have been proven.  *See Andrew*, 490 F.3d at 349-50.  Therefore, the District's claim that prong four would not be satisfied even if it had denied Lauren a FAPE is meritless.

The District also contends that the Hearing Officer erred in her determination that Lauren was a Protected Handicapped Student under § 504 in April 2008 because the District did not know and should not reasonably be expected to have known of Lauren's disability– her mental impairment.  The Hearing Officer correctly concluded that the District was well aware of Lauren's emotional and behavioral problems prior to its April 16, 2008 determination that Lauren was ineligible for a § 504 Plan.  In early 2008, a counselor from Bishop Shanahan informed the District that Lauren had behavioral issues.  Additionally, Lauren self-reported to the guidance counselor that she was seeing a psychiatrist.  Moreover, the guidance counselor knew

Lauren was struggling with attendance issues.  On March 8, 2008 Lauren was admitted to an inpatient psychiatric hospital for suicidal ideation.  Parents immediately informed the District of Lauren's hospitalization, and the guidance counselor wrote a note indicating that Lauren had been admitted for "possible bipolar, depression," and "suicidal thoughts."  On March 24, 2008, Parents emailed the guidance counselor a letter from Lauren's psychiatrist, stating that Lauren had been diagnosed with Major Depression, Attention Deficit/Hyperactivity Disorder, Obsessive Compulsive Disorder, and Anxiety Disorder.  At the beginning of April 2008, when Lauren returned to East High, she visited the guidance counselor or crisis counselor once or twice a week.

When the District's Child Study Team met to determine if Lauren was eligible for a § 504 Plan, the team only reviewed academic records, student meetings, and written feedback provided by Lauren's teachers.  The District ignored Lauren's psychiatric diagnoses, her inpatient and outpatient psychiatric hospitalization, and the fact that she was cutting classes to see the guidance or crisis counselor once or twice a week.  Despite all of this available information, the District did not conduct its own evaluation of Lauren to lean more.  Even worse, the District emailed Lauren's mother on the afternoon of April 15, 2008 to get additional information on Parents' request for § 504 Plan, but then issued a Denial of Eligibility Letter on April 16, 2008 without waiting for her response.  Ample evidence supports the Hearing Officer's conclusion that the District should be reasonably expected to have known about Lauren's disability.

### 2.  Lauren's Eligibility for Services Under the IDEA

The District also argues that the Hearing Officer erred in her determination that Lauren was a student eligible for special education under the IDEA because she suffered from an

emotional disturbance.  Under the IDEA a student is eligible for special education services if s/he

suffers from an emotional disturbance:

> Emotional disturbance means a condition exhibiting one or more of the following
> characteristics over a long period of time and to a marked degree that adversely
> affects a child's educational performance:
>
>> (A) An inability to learn that cannot be explained by intellectual, sensory, or
>> health factors.
>>
>> (B) An inability to build or maintain satisfactory interpersonal relationships
>> with peers and teachers.
>>
>> (C) Inappropriate types of behavior or feelings under normal circumstances.
>>
>> (D) A general pervasive mood of unhappiness or depression.
>>
>> (E) A tendency to develop physical symptoms or fears associated with
>> personal or school problems.

34 C.F.R. § 300.8(c)(4)(I).  The District's psychologist concluded that Lauren did not have an

emotional disturbance because it was unclear how long she exhibited the characteristics of

emotional disturbance and even if she was emotionally disturbed, it did not negatively impact on

her educational performance.  This conclusion is directly contradicted by two psychologists, one

who evaluated Lauren in December 2008 and January 2009, and the other who evaluated Lauren

in September 2010.  The District argues that its psychologist is allowed to reach a different

conclusion.  However, as the Hearing Officer determined, the District's conclusion is contrary to

the evidence.

The District psychologist notes in her ER that as early as January 2008, Lauren was

diagnosed with mood disorder, depression, anxiety, OCD, ODD, and major depression, severe.

The District's psychologist was aware of Lauren's multiple inpatient and outpatient

hospitalizations in 2008 for psychiatric reasons.  Additionally, the District psychologist was

aware of Lauren's diagnosis of Dysthymic Disorder, a disorder described in the DSM-IV as a chronic state of depression for a duration of at least two years within which no more than two months are free of mood symptoms.  Moreover, the District's psychologist was aware that beginning in the spring of 2008, Lauren was seeking help from the guidance counselor or crisis counselor at least once a week.  Furthermore, the District psychologist knew that Lauren's poor attendance was in part due to her hospitalizations and her frequent visits to the counselors' offices.  Lastly, the District psychologist knew that, by the fall of 2008, Lauren was failing several of her classes.  The above evidence amply supports the Hearing Officer's conclusion that Lauren suffered from an emotional disturbance that effected her educational performance.

## C.  Parent's Entitlement to Tuition Reimbursement

Parents are entitled to tuition reimbursement under the IDEA for unilaterally changing their child's placement to a private school if the following three elements are proven: (1) the District failed to offer the student a FAPE; (2) the private placement is appropriate; and (3) equitable considerations favor reimbursement.  *Florence Cnty Sch. Dist. Four v. Carter*, 510 U.S. 15-16 (1993).  Although the Third Circuit has not yet addressed whether tuition reimbursement is available for violations of § 504, several district courts have determined, based on the similarities between the IDEA and § 504, that tuition reimbursement is an available remedy for violations of § 504.  *See, e.g.*, *Molly L. ex rel. B.L. v. Lower Merion Sch. Dist.*, 194 F. Supp. 2d 422, 429 n.5 (E.D. Pa. 2002); *Kevin M. v. Bristol Twp. Sch. Dist.*, No. 00-6030, 2002 WL 73233 at *5 (E.D. Pa. Jan. 16, 2002); *Borough of Palmyra*, *Bd. of Educ. v. F.C.*, 2 F. Supp. 2d 637, 641-42 (D.N.J. 1998); *Christen G. v. Lower Merion Sch. Dist.*, 919 F. Supp. 793, 816, 821 (E.D. Pa. 1996).  Therefore, Parents entitlement to tuition reimbursement under § 504 and

the IDEA hinges on whether: (1) Lauren was denied a FAPE; (2) her placement at King George was appropriate; and (3) equitable considerations favor reimbursement.[13]

### 1.  Denial of a FAPE to Lauren

"School districts have a continuing obligation under the IDEA and § 504 to identify and evaluate all students who are reasonably suspected of a having a disability under the statutes." *P.P.*, 585 F.3d at 738.  This is referred to as the statutes' "child find" obligations.  *See id.*  A child who is suspected of having a qualifying disability must be identified and evaluated "within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." *W.B. v. Matula*, 67 F.3d 484, 501 (3d Cir. 1995), *abrogated on other grounds by A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007) (en banc).

Once a child is identified as having a disability under the IDEA, "school districts must work with parents to design an IEP, which is a program of individualized instruction for each

---

[13] The District argues that Parents have not met this test for tuition reimbursement. Alternatively, it argues that Parents are not entitled to tuition reimbursement under the IDEA because under the regulations it was not obligated to evaluate Lauren and provide her a FAPE until sometime during the 2009-2010 school year.  Pursuant to 34 C.F.R. § 300.301(c) and 22 Pa. Code § 14.123(b), a District must conduct an initial evaluation of a student within sixty days after receiving written parental consent for evaluation.  Additionally, 34 C.F.R. § 300.323(c) provides that a meeting to develop an IEP must be held within thirty days after a determination is made that a student needs special education.  Because Parents did not produce Lauren for evaluation under the IDEA within sixty days after providing written consent for evaluation, the District argues it was not legally obligated to evaluate Lauren in July 2009.  Pursuant to the above regulations, the District argues that its obligation to evaluate Lauren did not begin until the 2009-2010 school year, and the obligation to provide a FAPE did not start until even later in the 2009-2010 school year.  Despite the District's creative lawyering, this argument ignores the fact that the District did evaluate Lauren in July 2009 and then waited until October 21, 2009 to determine that Lauren was not eligible for special education under the IDEA.  The regulations at issue were intended to protect the rights of students by ensuring they are timely evaluated and provided with a FAPE.  They were not meant to insulate a District from liability when it has chosen to evaluate a student and then, after a long delay, improperly denied the student services under the IDEA.

special education student." *Ridley*, 680 F.3d at 269.  The IEP is "the primary mechanism for

delivering a FAPE." *Id.* (internal quotation marks omitted).  Like the IEP, a § 504 Plan is the

mechanism for providing a FAPE under § 504.  *Phil L.*, 799 F. Supp. 2d at 490.  Thus, for a child

with a qualifying disability, "a 'free appropriate public education' consists of educational

instruction specially designed to meet the unique needs of the handicapped child, supported by

such services as are necessary to permit the child 'to benefit' from the instruction." *Bd. of Educ.*

*of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 188-89

(1982).  When a school district violates its "child find" obligations and fails to identify a student

as a Protected Handicapped Student under § 504 or as a student in need of special education

under the IDEA, and provides no specialized instruction to the student to meet the unique needs

of his/her disability, the student has been denied a FAPE.  *See Forest Grove Sch Dist. v. T.A.*,

557 U.S. 230, 238-39 (2009) ("[W]hen a child requires special-education services, a school

district's failure to propose an IEP of any kind is at least as serious a violation of its

responsibilities under IDEA as a failure to provide an adequate IEP.")

### i.  Denial of a FAPE Under § 504

The Hearing Officer found that the District violated its "child find" obligations under §

504 in April 2008 when it failed to identify Lauren as a Protected Handicapped Student.

Additionally, the Hearing Officer found that the District did not provide Lauren with a § 504

Plan, and Lauren did not receive any specialized instruction to meet the unique needs of her

disability.  However, the Hearing Officer failed to determine whether the District's failure to

identify Lauren as a Protected Handicapped Student under § 504 in April 2008 was a denial of a

FAPE.  Rather, the Hearing Officer concluded that Lauren could not recover under § 504 because

Lauren left the District before March 11, 2009, the start of the recovery period.

Parents argue that the District denied Lauren a FAPE in April 2008 when it failed to identify her as a Protected Handicapped Student under § 504.  The District argues that even if Lauren is a Protected Handicapped Student, a school district's failure to provide a FAPE is not a violation of § 504.  As discussed in the prior section, the District's assertion is legally incorrect. In April 2008, the District violated its "child find" obligations when it failed to identify Lauren as a Protected Handicapped Student under § 504.  Because of this failure, the District never provided Lauren with specialized instruction to meet the needs of her disability.  Therefore, the District denied Lauren a FAPE under § 504 beginning in April 2008 until her graduation on August 15, 2009.

Parents decision to remove Lauren from the District in November 2008 was due to the District's failure to provide Lauren a FAPE under § 504.  The Hearing Officer's conclusion that Parents cannot recover because they removed Lauren from the District after it denied her a FAPE is contrary to the statute and established law.  *See Forest Grove*, 557 U.S. 230, 238-39 (holding that Parents are eligible for tuition reimbursement when a school district violates the IDEA by failing to provide a student with an IEP and the parents subsequently remove the student to a private school).  Parents are entitled to seek tuition reimbursement for the District's denial of a FAPE to Lauren under § 504 for the entire period of recovery within the statute of limitations– that is from March 11, 2009 to August 15, 2009.

### ii.  Denial of a FAPE under the IDEA

The Hearing Officer found that the District violated its "child find" obligations under the IDEA in July 2009 when it failed to identify Lauren as a student in need of special education

under the IDEA.  Additionally, the Hearing Officer concluded that the failure to identify Lauren

as a student in need of special education in July 2009 was a denial of a FAPE.   Specifically, the

Hearing Officer determined that the District could not violate its "child find" obligations prior to

July 9, 2009 because Parents had removed Lauren from the District in November 2008 and

thereby prevented the District from evaluating Lauren.  The Hearing Officer further determined

that it was reasonable to give the District two weeks to complete its evaluation of Lauren before

holding the District responsible for a denial of a FAPE.  Thus, the Hearing Officer concluded that

Lauren was not denied a FAPE until July 21, 2009.  The District concedes that if Lauren is a

student in need of special education under the IDEA then it denied her a FAPE beginning on July

21, 2009.

Parents argue that the District denied Lauren a FAPE under the IDEA much earlier then

July 2009 because the District should have identified Lauren as a student in need of special

education when it conducted its § 504 evaluation of Lauren in April 2008.   However, the reason

the Hearing Officer determined that Lauren was a student in need of special education is because

she suffers from an emotional disturbance.  To qualify as an individual with an emotional

disturbance, a person must exhibit characteristics of emotional disturbance "over a long period of

time." 34 C.F.R. § 300.8(c)(4)(I).  In April 2008, the District was aware that Lauren had been

diagnosed as of January 21, 2008 with Major Depression, Attention Deficit/Hyperactivity

Disorder, Obsessive Compulsive Disorder, and Anxiety Disorder.  The District was not provided

with any earlier history of emotional struggles.  Therefore, the District did not possess evidence

in April 2008 that Lauren had been exhibiting characteristics of emotional disturbance "over a

long period of time."  The evidence does not support Parents' argument that the District should

25

have identified Lauren as a student with an emotional disturbance in April 2008.

Alternatively, Parents argue that despite the fact that they unilaterally removed Lauren from the District in November 2008, and did not make her available for evaluation until July 9, 2009, the District denied Lauren a FAPE during this period.

In *Mary T. v. School District of Philadelphia*, the student was discharged from a psychiatric hospital on May 22, 2005.  575 F.3d 235, 239 (3d Cir. 2009).  The following day parents enrolled the student in a long-term psychiatric residential treatment center.  *Id.*  On June 15, 2005, approximately two weeks after learning of the student's placement in the residential treatment center, the school district sought to reevaluate the student and develop a new IEP.  *Id.* at 249.  However, with parents' consent, no evaluation took place for several months because of student's acute medical condition.  *Id.* at 250.   On October 12, 2005, Parents granted the school district permission to evaluate student because her condition had improved.  *Id.*  Thereafter, Parents alleged that student had been denied a FAPE from May 23, 2005 to October 12, 2005. *Id.* at 249.  In *Mary T.*, the Third Circuit held that the failure to evaluate the student and develop a new IEP was not the school district's fault, but was "attributable to the acute nature of [the student's] medical condition."  *Id.* at 251.  Accordingly, the Third Circuit held that the student had not been denied a FAPE.  *Id.*

In this case, Parents completed and signed a PTE- Evaluation Request form on October 30, 2008.  On November 24, 2008, the District sent Parents a PTE- Evaluation Consent Form, seeking permission to evaluate Lauren.  Parents never responded to the District's request to evaluate Lauren because they had already removed her from the District and placed her in King George.  Despite the District's willingness to evaluate Lauren, Parents did not make Lauren

available for testing until July 9, 2009.  As in *Mary T.*, the District is not responsible for the

failure to evaluate Lauren.  Like the parents in *Mary T.*, Parents chose not have Lauren evaluated

until a later date.  However, unlike *Mary T.*, the failure to evaluate Lauren cannot be attributed to

an acute medical condition; rather, it is attributable to Parents failure to follow through with

Lauren's evaluation.

"The IDEA was not intended to fund private school tuition for the children of parents

who have not first given the public school a good faith opportunity to meet its obligations."  *C.H.*

*v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 72 (3d Cir. 2010).  "[P]arents who, because of their

failure to cooperate, do not allow a school district a reasonable opportunity to evaluate their

disabled child, forfeit their claim for reimbursement for a unilateral private placement."  *Patricia*

*P. v. Board of Educ. of Oak Park*, 203 F.3d 462, 469 (7th Cir. 2000).  The evidence establishes

that Lauren was not denied a FAPE until July 2009 because Parents did not make Lauren

available for evaluation until then.

Lastly, Parents argue that even if a FAPE was not denied until July 2009, the date on

which Lauren was first denied a FAPE is July 9, 2009, the date the District conducted its

evaluation of Lauren.  Parents dispute the Hearing Officer's determination that the District

should be afforded two weeks to have completed its evaluation, and the resultant conclusion that

the District did not deny  Lauren a FAPE until July 21, 2009.  Although the Hearing Officer gave

the District a two week grace period to complete its ER, in actuality the District did not complete

its ER until October 21, 2009, at which point it incorrectly concluded that Lauren was not

entitled to services under the IDEA.  There is no legal basis for providing the District with this

grace period when in fact it took an unreasonably long time to complete its ER.  Therefore, I find

27

that the District denied Lauren a FAPE under the IDEA from July 9, 2009 until her graduation on

August 15, 2009.


### 2) The Appropriateness of Lauren's Placement at King George

The Hearing Officer determined that the day portion of the program at King George was

an appropriate placement for Lauren, but that there was no evidence that the residential portion of

the program was appropriate.  The District argues that there is no evidence that any portion of the

King George Placement was appropriate.  Parents argue the evidence supports that the entire

program was appropriate.

To be an appropriate placement, a private school need not be "perfect."  *Ridgewood*, 172

F.3d at 249 n.8.  However, it must "provide[] significant learning and confer[] meaningful

benefit."  *Mary T.*, 575 F.3d at 242 (internal quotation marks omitted).  A residential placement

is appropriate only if the placement is necessary for educational purposes.  *Id.* at 244-45.  Thus,

the issue is "whether placement was required for emotional problems and was therefore the

responsibility of the parents or social service agencies or whether full-time placement was a

necessary ingredient for learning."  *Kruelle v. New Castle Cnty. Sch. Dist.*, 642 F.2d 687, 693-94

(3d Cir. 1981).  To make this determination "we are to look to whether the 'social, emotional,

medical and educational problems . . . [are] so intertwined that realistically it is not possible for

the court to perform the Solomon-like task of separating them.'" *Mary T.*, 575 F.3d at 244

(quoting *Kruelle*, 642 F.2d at 694).

In the Fall of 2008, Lauren was failing four of her classes, struggling with attendance

problems, and struggling emotionally.  In November 2008, Lauren's psychologist recommended

a therapeutic residential boarding school, which she believed was necessary to address Lauren's "failing grades" and "recurrent acting-out behaviors," and would assist Lauren in "school success. As a result, Parents sent Lauren to King George in late November. Shortly after her arrival, Lauren was again evaluated, and a second psychologist affirmed the importance of Lauren's placement in a residential boarding school for her schooling and mental health. At King George, Lauren received individual and group therapy, participated in academic classes and therapeutic activities like rock climbing and art classes, and attended a substance abuse program. Lauren devoted roughly half of each week to academics. At some point, the staff realized that Lauren's obsessive compulsive disorder caused her to freeze when she came across certain numbers and impeded her ability to do math. P-71 at 4  The staff was able to allay these compulsive thoughts related to numbers by providing Lauren with therapy. *Id.* Remarkably, Lauren attended and passed all of her classes at King George. Lauren was so successful at King George that she was able to graduate early. Additionally, she was able to competently transition from King George to Bloomsburg University.

Those surrounding Lauren, including Lauren herself, recognize the immense academic and emotional strides Lauren made at King George. Lauren's therapist describes her as a "'poster child' for the growth and development made at [King George]." P-71 at 4. Lauren's mother explains that Lauren "definitely flourished there and felt much better about herself." N.T. 156:21-23. "Lauren report[s] that her experiences at the King George School were central in treating her psychological difficulties," and that since King George she has become a "more confident learner." P-73 at 5, 16. Moreover, the psychologist who conducted Lauren's IEE notes that "Lauren did well emotionally and academically." P-73 at 3. The IEE psychologist also

29

states that "Individual and group therapies and the general program and atmosphere at the school helped Lauren's mood, motivation and general ability to focus on life and academics."  P-73 at 16.

It is indisputable that Lauren succeeded both academically and emotionally at King George.  Clearly, King George provided "significant learning" and conferred meaningful" benefit to Lauren.  Although the District argues that Lauren needed the residential program because of substance abuse[14] and emotional problems, the record shows that Lauren's placement was a "necessary ingredient for learning," and that her emotional problems are so intertwined with her educational problems that they cannot be separated.  To a large extent, Lauren's math problems were the result of her obsessive compulsive disorder, which resulted on her fixation on certain numbers.  Additionally, Lauren's attendance problems are directly attributable to her emotional problems.  For instance, while at East High, Lauren felt the need to cut classes to see the guidance counselor and crisis counselor at least once a week.  Lauren's IEE confirms the inseparable nature of Lauren's academic and emotional struggles in its conclusion that Lauren's emotional disturbance "impeded her ability to learn, access academic curriculum and attend school on a daily basis to a marked degree."  P-73 at 16.  Given the immense improvement that Lauren made both academically and emotionally while at King George, and the consensus of three experts that a residential program was necessary for Lauren's academic and emotional success, I find that King George was an appropriate placement for Lauren.

### 3.  Equitable Considerations

---

[14] Although Lauren had substance abuse problems, these problems were the result of Lauren's attempt to self medicate.  *See* H.O.D. ¶ 11; P-73 at 14.  Thus, they are part and parcel of her emotional problems and should not independently be considered.

The Hearing Officer determined that equitable considerations favored providing tuition reimbursement to Parents. The District argues that due to equitable considerations it should not have to provide tuition reimbursement any earlier than July 21, 2009 because Lauren was not made available for an evaluation under the IDEA until July 9, 2009.

### i.  Equitable Considerations for Tuition Reimbursement Under § 504

Parents unilateral removal of Lauren from the District in November 2008 does not negatively impact Parents entitlement to tuition reimbursement under § 504 because Parents removed Lauren after the District had already denied Lauren a FAPE. Although, Lauren was denied a FAPE under § 504 in April 2008, the statute of limitations prohibits Parents from receiving any recovery for the period from April 2008 until March 11, 2009. Parents cannot recover for this period under the statute of limitations because they waited until March 11, 2011 to file a due process complaint. Parents did not file a formal complaint until March 11, 2011 because they first tried to resolve their differences with the District through settlement. If Parents had initially chosen to litigate, rather than attempt to settle, they would have been able to recover for the entire period that Lauren was denied a FAPE under § 504. That Parents could have recovered more if they had not first attempted settlement is an equitable consideration that weighs strongly in favor of awarding Parents full tuition reimbursement for the allowable period of recovery. Therefore, I find that equitable considerations favor tuition reimbursement under § 504 for the period from March 11, 2009 to August 15, 2009.

### ii.  Equitable Considerations for Tuition Reimbursement Under the IDEA

Although Lauren was denied a FAPE under § 504 in April 2008, she was not denied a FAPE under the IDEA until July 2009 because Parents unilaterally removed her from the District

31

and did not produce her for evaluation under the IDEA until July 9, 2009.  In *Cape Henlopen*, the

Third Circuit explained that "[t]he IDEA was not intended to fund private school tuition for the

children of parents who have not first given the public school a good faith opportunity to meet its

obligations.  606 F.3d at 72.  Accordingly, the *Cape Henlopen* Court held that equitable

considerations weighed against tuition reimbursement where the parents had "disregarded their

obligation to cooperate and assist in the formulation of an IEP, and failed to timely notify the

District of their intent to seek private school tuition reimbursement."  *Id.*  Because Parents did

not return Lauren to the District for an evaluation under the IDEA until July 9, 2009, I find that

equitable considerations disfavor tuition reimbursement under the IDEA prior to July 9, 2009.

However, I find that equitable considerations favor tuition  reimbursement under the IDEA for

the period from July 9, 2009 to August 15, 2009.

## IV.  CONCLUSION

For the reasons stated above, I conclude that Parents are entitled to tuition reimbursement

under § 504 from March 11, 2009 to August 15, 2009.[15]  Therefore, I will grant in part and deny

in part Plaintiffs' Motion for Judgment on the Administrative Record and Defendant's Motion

for Disposition on the Administrative Record.


  S/Anita B. Brody
ANITA B. BRODY, J.

---

[15] Both § 504 and the IDEA entitle Parents to tuition reimbursement and they may recover
the tuition paid to King George under either statute.  However, they are only entitled to tuition
reimbursement under the IDEA from July 9, 2009 to August 15, 2009.

Copies **VIA ECF** on _____ to:     Copies **MAILED** on _____ to:

O:\ABB 2012\L - Z\Lauren G. v. West Chester Memorandum.wpd

<u>**Appendix A**</u>

**Glossary of Terms**

**ER**            Evaluation Report

**FAPE**          Free Appropriate Public Education

**H.O.D.**        Hearing Officer's Decision

**IEE**           Independent Educational Evaluation

**IEP**           Individualized Education Plan

**IDEA**          Individuals with Disabilities Education Act

**NOREP**         Notice of Recommended Educational Placement

**PTE**           Permission to Evaluate

**RA**            Rehabilitation Act

**Appendix B**

**Court Established Timeline**

- **2006-2007**                    Lauren attends ninth grade at Bishop Shanahan.

- **2007- Beginning 2008**         Lauren begins tenth grade at Bishop Shanahan.

- **January or**                   Lauren returns to the District and attends East High.
  **February 2008**

- **March 8, 2008**                Lauren is admitted to Devereux, an inpatient psychiatric hospital,
                                   for suicidal ideation.

- **March 9, 2008**                Parents inform the District of Lauren's hospitalization.

- **March 21, 2008**               Lauren is discharged from Devereux and enters American Day, an
                                   outpatient care program.

- **March 24, 2008**               Parents email the District a letter from Lauren's psychiatrist stating
                                   that Lauren has been diagnosed with Major Depression, Attention
                                   Deficit/Hyperactivity Disorder, Obsessive Compulsive Disorder,
                                   and Anxiety Disorder**.**

- **Early April 2008**             Lauren returns to East High after treatment at American Day.

- **Early April 2008**             Parents request that the District begin the process of getting Lauren
                                   a § 504 Plan.  This requests comes after a friend informs Lauren's
                                   mother that Lauren's hospitalization is a "huge red flag" for the
                                   District to provide Lauren with accommodations.

- **April 15, 2008**               Guidance counselor emails Lauren's mother seeking additional
                                   information about Parents' request for a § 504 Plan for Lauren.

- **April 16, 2008**               District issues a Denial of Eligibility Letter informing Parents that
                                   Lauren is not eligible for a § 504 Plan.

34

- **September &**            Lauren frequently visits crisis counselor**.**
  **October 2008**

- **September 29, 2008**      Lauren tells crisis counselor that her "moods and emotional [sic]
  are not right."

- **October 2008**           Lauren tells crisis counselor that she has feelings of not wanting to
  do anything.

- **October 2008**           Guidance counselor notes that Lauren is failing classes.

- **October 20, 2008**        Parents request that the District conduct a psychiatric and
  psychoeducational evaluation of Lauren.

- **October 23, 2008**        Lauren is again admitted to American Day because she is acting
  erratically, smoking marijuana, and stole her mother's car.

- **October 30, 2008**        Parents complete a PTE-Evaluation Request Form requesting an
  evaluation of Lauren.  The request notes Lauren's diagnoses of
  Mood Disorder, OCD, ODD, depression, and an anxiety disorder.

- **End of October 2008**     Lauren's psychiatrist and psychologist recommend that Parents
  meet with an educational consultant to place Lauren.

- **November 2008**          Lauren's psychologist recommends that Lauren transfer to a
  therapeutic residential boarding school.

- **November 5, 2008**        First quarter of school ends.  Lauren's first quarter grade report
  indicates that she is failing history, earth science, Spanish, and
  Algebra.

- **November 7, 2008**        Lauren is discharged from American Day.

- **November 10, 2008**       District psychologist determines that it is not necessary to conduct
  a psychiatric evaluation of Lauren.

- **November 24, 2008**       District issues a PTE-Evaluation Consent form seeking to conduct
  an evaluation of Lauren to see if her Mood Disorder adversely
  affects her educational performance.

- **Between November**       Lauren begins attending King George, a therapeutic boarding
  **17 and 28, 2008**          school in New England.

| | |
|---|---|
| • **November or December 2008** | Parents retain legal counsel. |
| • **December 2008** | Date on which Parents knew or should have known about the alleged action that forms the basis of Parents' complaint. |
| • **December 16, 2008 & January 5, 2009** | Private psychologist hired by Parents evaluates Lauren and concludes that Lauren qualifies as an educationally disabled person because she has a serious emotional disturbance and a learning disability in math.  Recommends Lauren's placement in a therapeutic boarding school for two years or more. |
| • **April 1, 2009** | Parents file due process complaint seeking only an IEE, which the District declines to provide. |
| • **April 16, 2009** | District agrees to conduct its own evaluation of Lauren.  However, Lauren is unavailable for testing because she is nine hours away at King George. |
| • **July 9, 2009** | Lauren returns to the District and is evaluated.  District psychologist has access to Lauren's diagnoses from two previous psychiatric hospitalization programs, as well as the private psychological evaluation completed in January 2009. |
| • **August 15, 2009** | Lauren graduates from King George. |
| • **October 21, 2009** | District completes its ER for Lauren and issues a NOREP.  The ER concludes that Lauren does not have a disability and is not eligible for special education.  The NOREP concludes that Lauren is not in need of a § 504 Plan or an IEP. |
| • **November 5, 2009** | Parents request an IEE at public expense. |
| • **April 16, 2010** | District agrees to fund an IEE for Lauren. |
| • **September 15, 2010** | Psychologist completes an IEE of Lauren and concludes that Lauren has an emotional disturbance and is eligible for special education services. |
| • **March 11, 2011** | Parents file a formal due process complaint against the District and request a due process hearing. |